June 15, 1998

   NO. 4-97-0455

IN THE APPELLATE COURT 

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from

Plaintiff-Appellee, )  Circuit Court of

v. )  Sangamon County

GERALD K. CURTIS, )  No. 96CF641

Defendant-Appellant. )  

    )  Honorable

)  Steven Nardulli,

)  Judge Presid­ing. 

_________________________________________________________________

JUSTICE STEIGMANN delivered the opinion of the court:

In January 1997, following a bench trial, the trial court found defendant, Gerald K. Curtis, guilty of aggra­vated battery with a firearm, aggravated battery, and armed violence (720 ILCS 5/12-4.2, 12-4(a), 33A-2 (West 1996)).  The court subse­quent­ly vacated the armed violence conviction.  In May 1997, the court sen­tenced defen­dant to 12 years in prison for aggravat­ed battery with a firearm and held that his aggra­vated battery conviction merged into his conviction for aggravated battery with a firearm.

Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt because the State's case essentially consisted only of a prior inconsistent state­ment admitted under section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 1996)), which the witness disclaimed at trial; and (2) the evidence was not suffi­cient to show that defendant was guilty on a theory of account­ability.  We affirm.

I.  BACKGROUND

The evidence at defendant's trial showed the following.  On July 1, 1996, Marie Hullum was sitting on the front porch of her house on 13th Street in Springfield, Illinois, with her grand­daugh­ter, Jovonsierre Frank­lin, her son, Gerald Hullum, and a woman.  Around 8:15 p.m., a car stopped on the street across from Marie's house.  Marie heard two shots.  After the second shot, Jovonsierre screamed about her leg, and Marie took her inside.  Jovonsierre had been shot and the bullet traveled through her left thumb and left leg and stopped in the back of her right leg.  

Jerome Henderson testified at trial that he was about 1½ blocks away from the shooting when he heard the shots.  He saw a small, grayish-blue, four-door car on 14th Street, but he did not see who was in the car and did not remem­ber seeing defendant or his half-brother, Joshua Curtis (Josh).  He testi­fied that many people were in the area and he remem­bered hearing Reggie Thomas yelling some­thing.  Henderson, who was awaiting trial on several criminal charges, testified that the prosecutor had made no promises in exchange for his testimo­ny.  

Detective Tim Young testi­fied that he had ob­tained a written state­ment from Henderson on July 5, 1996, after a police officer informed him that Henderson had information concerning the shooting.  Henderson reviewed his written state­ment for accuracy before signing it.  Young also testified that Henderson told him that defendant was not in the car.   

Henderson testified at trial that he did not remember signing a state­ment after Young interviewed him on July 5, 1996.  In his state­ment, Henderson had stated that he heard Thomas yelling, warning people that defendant and Josh were in the area and had guns.  At trial, Henderson remem­bered telling Young that about the same time as he heard Thomas yelling, (1) he saw a small, gray­ish-blue, four-door car cross the inter­section at 13th Street and Cass Avenue by Gerald Hullum's house; (2) Gerald was standing in front of his house; and (3) he heard four or five shots.  He did not remember telling Young that (1) Terry Lee was driving the car and Josh was sitting next to her; (2) he saw Josh come out of the passenger's side window with a black automatic weapon in his hand and point it over the top of the car toward Gerald; (3) he saw several people standing around the area, includ­ing Marcus Poole; (4) he heard a girl scream; and (5) he saw Lee accelerate and drive away.  The trial court admitted Henderson's statement regarding Thomas yelling "for the purpose of explaining Mr. Henderson's subsequent conduct but not substan­tively on the question of whether or not [defendant], in fact, had a gun."

Young also testified that Officer Scott Allin in­formed him that Poole had told him--before the incident resulting in his arrest--that he wanted to provide infor­ma­tion about the shoot­ing.  Young inter­viewed Poole at the Sangamon County jail, where Poole was incar­cerated for unrelated charges.  Poole signed a written state­ment after re­viewing it to ensure its accuracy.  Young told Poole that he would talk to the State's Attorney's office and try to secure Poole's release in exchange for his cooper­ation; howev­er, he did not promise that he would be able to secure Poole's release in ex­change for his state­ment.  Young testified that he talked to the State's Attorney's office on Poole's behalf the following day, and as a result, Poole was released on a recogni­zance bond.  

Poole testified at trial that (1) charges of aggra­vat­ed battery and criminal tres­pass to real property were pending against him; (2) he had recently pleaded guilty to a reduced charge of robbery and been sentenced to probation; and (3) the prosecutor had made no promises regarding his guilty plea or his pending charges in exchange for his testimony.

Poole also testified that he had known defendant for about six years.  On July 1, 1996, he was visiting a friend's house on 13th Street.  He saw a blue car driven by a woman, but he did not see who was inside the car.  He saw a handgun, heard a shot from inside the car, and ran.  He heard about 11 shots.  He denied seeing defendant or Josh in the car.  

Poole further testified that he was arrested on July 4, 1996, on charges unre­lated to the shoot­ing.  Shortly after his ar­rest, he talked to Young and told him that he would not talk about the shooting unless he could get out of custo­dy.  He then made and signed a written statement regarding the shooting.  

Poole's signed statement read as follows:

"Last Monday night (07-01-96) I was walking down the street going to my cousins Gerald Hullum house 830 S. 13th St.  I was a Milton Lacy's house 924 S. 13th St. and was on the way Gerald.  As I was walk­ing, I seen a dark blue car stop in the road facing South Grand.  It was on the opposite side of the road.  I was walking towards Cook St.  I looked over at the car and saw a girl Teri Lee (spell­ing unsure) in the front seat driv­ing.  In the back seat was two guys [black males].  I know the guy in the back seat on the driver[']s side was Ger­ald Curtis.  On the passen­ger side in the back seat was was his brother Josh Curtis.  I saw Gerald Curtis take his hat off and he then took out a big black gun [and
] point­ed it out of the window.  He turned the gun side­ways and he started shooting at me.  Josh Curtis then came out the car window with a gun and was shooting over the top of the car.  I heard a little girl who was my neice 
screaming.  I knew that she had been hit.  I know that Gerald is the one who shot my neice cause Josh hadn't started shooting yet when my neice screamed.  My broth­er Malcom was stand­ing out in front of 924 S. 13th St.  As Terri drove away they had to see my brother Malcom and they was shoot­ing at my brother and they hit Milton in the leg.  I took off run­ning to­wards 14th St to get away from them.  This happened because of something that hap­pened about two months ago where he was shot."

At trial, Poole disavowed this statement, denied seeing Josh or defendant in the car, and stated that he had lied when he made the written statement so that he would be released.

The trial testimony also showed that defen­dant had a bedroom at his mother's house where he stayed periodically; he was the only person who used that room.  Josh also stayed at the house period­i­cal­ly and slept on a couch in the living room.  The police searched the house and found two semiautomatic guns in the living room, a .40-caliber black Smith & Wesson Iberia and a .25-caliber Loricin.  In defendant's bed­room, they found several boxes of ammuni­tion, includ­ing a partial box of .40-caliber full metal jacket bullets that were consis­tent with the bullets in the Iberia's clip.

Scientific testing determined that the bullet recov­ered from Jovonsierre's leg was fired from the Iberia.  Three spent car­tridge cases found in the 900 block of 13th Street were extracted or fired from the Iberia and were consistent with the .40 caliber bullets in the box found in defendant's bed­room.

II.  SUFFICIENCY OF THE EVIDENCE WHEN THE CONVICTION IS BASED

UPON A RECANTED PRIOR INCONSISTENT STATEMENT ADMITTED

UNDER SECTION 115-10.1 OF THE CODE

A. Standard of Review

Defendant first argues that the State failed to prove him guilty beyond a reasonable doubt of the offenses of aggra­vated battery with a firearm and aggravated battery.  Specifical­ly, he contends that (1) the only evidence against him was Poole's statement to the police, which was admitted under section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 1996)), and which he recant­ed during the trial; and (2) such evi­dence is not suffi­cient to sustain a convic­tion.  We note that defendant does not appeal the trial court's admission of Poole's statement under section 115-10.1 of the Code.

We disagree with defendant's premise that the 
only
 evidence against him was Poole's recanted prior incon­sis­tent statement.  As the State points out, the bullet recovered from the victim's leg was fired from the Iberia which the police found during a search of defendant's home.  That bullet and three car­tridge cases found in the street where the shoot­ing occurred were consistent with the .40-caliber bullets in the partial box of ammunition the police found in defendant's bed­room.  

     Nevertheless, even assuming 
arguendo
 the accuracy of defendant's charac­ter­iza­tion of the evidence, we still reject defendant's argument.  We note that defendant cites some appel­late court decisions which--he claims--suggest or hold that a recanted prior inconsis­tent state­ment admitted under section 115-10.1 of the Code is not suffi­cient to sustain a convic­tion.  See 
People v. Park­er
, 234 Ill. App. 3d 273, 281, 600 N.E.2d 529, 534 (1992) (evi­dence not suf­fi­cient to support convic­tion where prior incon­sistent state­ments by three State witnesses were impeached); 
People v. Arcos
, 282 Ill. App. 3d 870, 875, 668 N.E.2d 1177, 1180 (1996) (evi­dence insufficient to sustain conviction where alleged eyewitness disavowed his previous out-of-court state­ments at trial); see also 
People v. Reyes
, 265 Ill. App. 3d 985, 990, 638 N.E.2d 650, 654 (1993) (witnesses' dis­avowed grand jury testimony that defendant partic­ipated in the crime was not suffi­cient to support conviction).  We are not convinced that these cases stand for the proposition defendant urges upon us, but if they did, we would decline to follow them.

Defendant asserts a now-dis­credit­ed stan­dard of appel­late review in criminal cases that would shift depending upon the nature of the trial evidence.  Some examples of these dis­credited standards are the following.  

The stan­dard of review for sex-offense cases former­ly re­quired that a victim's testimony be clear and con­vinc­ing or substantial­ly corroborated.  
People v. Cole
, 193 Ill. App. 3d 990, 996, 550 N.E.2d 723, 728 (1990)
 (although a special concur­rence in 
Cole
 ques­tioned the validity of this special stan­dard (
Cole
, 193 Ill. App. 3d at 998-99, 550 N.E.2d at 728-29 (Steigmann, J., specially concur­ring))).   Shortly thereaf­ter, in 
People v. Roy
, 201 Ill. App. 3d 166, 558 N.E.2d 1208 (1990), this court refused to follow the "substan­tially corrobora­ted or clear and convinc­ing" stan­dard in sex-offense cases, stating as fol­lows:

"[T]here is no additional requirement that in a case in which a sex offense is charged[,] the State must, in addition to proving the defendant guilty beyond a reason­able doubt, demonstrate either the evidence is substan­tially corroborated or the victim's testimony is clear and convincing.  The tes­timony of no other category of crime victim is held to be automatically suspect or to require addition­al proof beyond the statutory requirements."  
Roy
, 201 Ill. App. 3d at 185, 558 N.E.2d at 1221.

In 
People v. Schott
, 145 Ill. 2d 188, 202, 582 N.E.2d 690, 696 (1991),
 the supreme court abol­ished the special stan­dard, af­firming 
Roy
. 

Cases involving circumstantial evidence have also been subject to a more stringent evidentiary standard in the past.  Illi­nois Pattern Jury Instructions, Criminal, No. 3.02 (3d ed. 1992) (here­in­af­ter IPI Criminal 3d) former­ly included a second para­graph that read:  "You should not find the defendant guilty unless the facts or circum­stances proved exclude every reason­able theory of inno­cence."  See IPI Criminal 3d No. 3.02, Commit­tee Note.  In 
People v. Bryant
, 113 Ill. 2d 497, 510-11, 499 N.E.2d 413, 419 (1986), the supreme court rejected this "reason­able hypothe­sis of innocence" test for cases in which the evi­dence of guilt is entirely circum­stan­tial, stating as fol­lows:

"`Circumstan­tial evi­dence in this re­spect is in­trin­si­cal­ly no different from tes­timonial evi­dence.  Admit­tedly, circumstan­tial evidence may in some cases point to a wholly incorrect re­sult.  Yet this is equally true of testimo­ni­al evidence.  In both in­stances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possi­bility of inaccuracy or ambiguous inference. *** If the jury is con­vinced be­yond a reason­able doubt, we can require no more.'"  
Bryant
, 113 Ill. 2d at 510-11, 499 N.E.2d at 419, quot­ing 
Holland v. United States
, 348 U.S. 121, 139-40, 99 L. Ed. 150, 166-67, 75 S. Ct. 127, 137-38 (1954).

Noting that the presumption of innocence and the burden of proof remain the same regardless of the type of evi­dence involved in a case, the supreme court in 
Bryant
 held that the trial court should not use the second paragraph of IPI Criminal 3d No. 3.02 to instruct the jury because it suggests that a unique stan­dard governs cases in which the evidence of guilt is circum­stan­tial and that the burden of proof in those cases differs in some funda­men­tal respect.  
Bryant
, 113 Ill. 2d at 510-11, 499 N.E.2d at 419.  
 

In 
Schott
, the supreme court repeated its rejection of the reasonable hypothesis of innocence test and 
reiterated the standard of review for cases chal­lenging the sufficiency of the evidence, stat­ing as fol­lows:

"[W]here the evidence is claimed to be insuf­ficient on review, 
regardless
 
of
 
the
 
nature
 
of
 
the
 
evidence
 [(emphasis added)], the rea­son­able doubt test *** should be applied. *** [C]riminal convic­tions are not to be over­turned on re­view unless the evidence is so improbable or un­satisfactory that it creates a reasonable doubt of the defendant's guilt.  The test to be employed on review `"is wheth­er, after view­ing the evidence in the light most favor­able to the prosecution, 
any
 ratio­nal trier of fact could have found the essen­tial ele­ments of the crime beyond a reason­able doubt."' [Citation.]"  (Emphasis in orig­inal.)  
Schott
, 145 Ill. 2d at 203, 549 N.E.2d at 697.

Statutes occasionally may require trial courts to impose a more strin­gent test for the admissi­bili­ty of certain kinds of evi­dence.  See 
People v. Zwart
, 151 Ill. 2d 37, 600 N.E.2d 1169 (1992) (in which the supreme court applied the re­quire­ment of section 115-10 of the Code that hearsay evi­dence from a victim of a child sexual offense is admis­si­ble only if the time, con­tent, and circum­stances of the declarant's statements provide suffi­cient safe­guards of reli­ability (725 ILCS 5/115-10(b) (West 1992))).  But even under that specialized standard of 
admissibility
 of evidence at the trial level, the standard of 
appellate
 
review
--to apply when considering a defendant's claim that the evidence against him was not sufficient to sustain his conviction--remains the same as in any other criminal case on appeal--namely, whether any rational trier of fact, viewing the evi­dence in the light most favorable to the prosecution, could find the essen­tial elements of the crime proved beyond a reason­able doubt.  
People v. Back
, 239 Ill. App. 3d 44, 74, 605 N.E.2d 689, 709 (1992).  

Based on the supreme court's teachings, we conclude that no "sus­pect catego­ries" of proper­ly admit­ted evi­dence exist any longer so as to require a differ­ent stan­dard of appellate review; thus, courts of review should no longer differ­en­ti­ate between types of evi­dence properly admitted before the trier of fact.  When an ac­cused is con­vict­ed and ap­peals, one stan­dard ap­plies to all evi­dence.  Evidence of prior in­con­sis­tent state­ments--even if the de­clar­ant has re­cant­ed those state­ments--should be treated no dif­fer­ent­ly.  

In 
People v. Bailey
, 265 Ill. App. 3d 262, 276, 638 N.E.2d 192, 201 (1994), the appellate court ob­served as fol­lows:

"Our leg­isla­ture *** has seen fit, con­sis­tent with its leg­isla­tive au­thor­ity, to pre­scribe meth­ods of proof and rules of evi­dence.  Sec­tion 115-10.1 of the Code [(725 ILCS 5/115-10.1 (West 1996))] pro­vides that under cer­tain ex­press­ly enu­mer­ated cir­cum­stances, prior in­con­sis­tent state­ments can be uti­lized as sub­stan­tive proof."  

Once a jury or trial court has chosen to return a guilty verdict based upon a prior inconsistent statement, a reviewing court not only is under no obligation to determine whether the declarant's testimo­ny was "substantially corrob­orated" or "clear and convinc­ing," but it may 
not
 engage in any such analysis.  To the ex­tent that any of our sister dis­tricts have held otherwise, we deem such hold­ings incon­sistent with supreme court teach­ings, and we decline to follow those decisions.

B. The Recanted Prior Inconsistent Statement  

Defendant next contends that Poole's written state­ment was not credible because Poole's trial testimony contradicted his out-of-court state­ment.  Deter­mi­nations of the credibili­ty of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence lie within the province of the trier of fact.  
People v. Oaks
, 169 Ill. 2d 409, 457, 662 N.E.2d 1328, 1349 (1996).  It is in a better posi­tion to assess witness credi­bili­ty because it may observe the witnesses' demeanor and consid­er any con­flicts or inconsis­ten­cies in their testimo­ny.  

  
 In this case, Poole testified in court and was cross-exami­ned by defense counsel; the prior inconsistent state­ments related to events within his personal knowledge; and he acknowl­edged under oath that he gave those state­ments to Young on July 4, 1996.    

The trial court, in weighing the evidence and assessing Poole's credibility, determined that he was telling the truth in his out-of-court statement and lying at trial.  Based on the evi­dence in this case, we con­clude that the court could have found defendant's prior inconsistent statement more believ­able than his trial testimony.  See 
People v. McBounds
, 182 Ill. App. 3d 1002, 1014, 536 N.E.2d 1225, 1234 (1989) (in which the trial court found witnesses' prior inconsistent statements more trustworthy than their trial testi­mony).  

C. The Absence of Certain Findings

Defendant also contends that "the trial court obviously did not determine that the physical evidence corroborated Marcus Poole's out-of-court statements, given the absence of any mention of such in its findings."  Defendant bases this contention on the court's failing to single out certain evidence when it stated its verdict.  We dis­agree.

The trier of fact in a bench trial is not re­quired to mention every­thing--or, for that matter, anything--that con­tribut­ed to its verdict.  155 Ill. 2d R. 366(b)(3)(i); see 
Stony Island Church of Christ v. Stephens
, 54 Ill. App. 3d 662, 668, 369 N.E.2d 1313, 1318 (1977) (trial court's order need not include findings of fact or conclu­sions of law).  In a jury trial, the jury pro­vides no expla­nation whatso­ever for its verdict.  
In a bench trial, even though it may be desirable for the trial court to explain its decision, the court's elec­tion not to comment or its failure to specif­i­cal­ly mention certain por­tions of the testimony does not permit a defen­dant on appeal to claim that those por­tions not mentioned played no role in the court's determina­tion.  If the record con­tains facts which support an affirmance of the trial court's finding, the reviewing court may take those facts into account even if the trial court did not state it explicitly relied upon them.  
Bailey
, 265 Ill. App. 3d at 278, 638 N.E.2d at 202.

The trial court here expressly stated that it consid­ered Poole's prior statement and found it sufficient beyond a reason­able doubt.  Other evi­dence we have already discussed sup­ported the court's deci­sion.  
Viewing the record before us, 
we con­clude that the State pre­sent­ed suffi­cient evidence to sustain defendant's convic­tions.   

III.  SUFFICIENCY OF THE EVIDENCE

TO SUPPORT AN ACCOUNTABILITY THEORY

Last, defendant argues that the State failed to prove him guilty beyond a reasonable doubt of the charges based on an ac­countabili­ty theory.  He bases this argument on the remarks of the trial court when, in announcing its guilty ver­dict, it referred to the State's alternative theories of defendant's guilt either as a principal or as one accountable for the criminal conduct of others.  Because the court did not explicitly state which theory it based its guilty verdict on, we will address defendant's ac­count­ability argument.  

Defendant con­tends that the State pre­sented no credi­ble evidence that he shared a common criminal design or intent with Josh before or during the shoot­ing.  We disagree.

A person is legally accountable for the conduct of another when, either before or during the commission of an offense, and with the intent to promote or facilitate the of­fense, he solicits, aids, abets, or agrees or attempts to aid such a person in the planning or commission of the offense.  720 ILCS 5/5-2 (West 1996).  To successfully prosecute a defen­dant on an account­ability theory, the State must establish beyond a reasonable doubt that (1) the defendant solic­it­ed, aided, abet­ted, or agreed or attempted to aid another person to plan or commit the offense; (2) such participa­tion took place before or during the commission of the offense; and (3) the defendant had the concurrent, specific intent to promote or facilitate the commission of the offense.  
Bailey
, 265 Ill. App. 3d at 274, 638 N.E.2d at 200.  A defendant's presence at the scene of a crime plus his knowl­edge that a crime is being commit­ted, without more, is not suffi­cient to establish accountabil­ity.  
People v. Taylor
, 164 Ill. 2d 131, 140, 646 N.E.2d 567, 571 (1995).  
Nevertheless, active participation is not a re­quire­ment for convic­tion under an accountabili­ty theory.  
Taylor
, 164 Ill. 2d at 140, 646 N.E.2d at 571.  

When a defendant challenges his conviction based on the sufficiency of the evidence, the relevant question is whether, after viewing all the evi­dence in the light most favor­able to the prosecu­tion, any ratio­nal trier of fact could have found the essential ele­ments of the crime beyond a reason­able doubt.  
Oaks
, 169 Ill. 2d at 457-58, 662 N.E.2d at 1349-50.  To prove that a defendant had the intent to promote or facili­tate a crime, the State must estab­lish beyond a reason­able doubt that he showed the criminal intent of the principal or that a common criminal plan or purpose existed.  
Taylor
, 164 Ill. 2d at 140-41, 646 N.E.2d at 571.  The fact finder may infer a common design from the circum­stances surrounding the unlawful conduct.  
Taylor
, 164 Ill. 2d at 141, 646 N.E.2d at 571.  Proof that the defendant was present during the perpetration of the offense, that he main­tained a close affilia­tion with his companion after the commis­sion of the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining a defendant's legal account­ability.  
Taylor
, 164 Ill. 2d at 141, 646 N.E.2d at 571. 

 
On the facts of this case, to accept defendant's argu­ment that ac­count­abil­ity does not apply here, we would have to con­clude that when two people are shoot­ing from the same car at someone on the side­walk, neither is crimi­nally responsi­ble for the other's conduct.  To state that propo­sition is to demon­strate its absur­di­ty.  Defendant's conten­tion that the State pre­sent­ed no credi­ble evidence that defen­dant shared a common criminal design or intent with Josh before or during the shoot­ing when each of them had a gun and each fired out of the car is equally absurd.

Viewing the evidence in the light most favor­able to the prosecution, we conclude that the State pre­sent­ed suffi­cient evidence to sustain defendant's convictions based upon a theory of account­ability.

IV.  CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

GARMAN, P.J., and COOK, J., concur.